UNITED STATES of America, Plaintiff–Appellee,

v.

Kenneth T. HAYWARD, and William B. Krause, Jr., Defendants–Appellants.

Nos. 91–3253, 91–3568.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1993.

Decided Oct. 5, 1993.

George P. Lynch, Downers Grove, IL (argued), for Kenneth T. Hayward.

M. Jacqueline Walther (argued), Kielian & Walther, Leland Shalgos (argued), Chicago, IL, for William B. Krause, Jr.

Before FLAUM and MANION, Circuit Judges, and MILLER, JR., District Judge.*

MANION, Circuit Judge.

The United States of America ("government") charged Kenneth T. Hayward and William B. Krause ("defendants") with various crimes associated with the burning of two crosses on the property of a white family who had entertained black people in their home. The defendants were tried and convicted. On appeal, they challenge the district court's application of 18 U.S.C. § 844(h)(1) (use of fire or an explosive to commit a felony) and 42 U.S.C. § 3631(b) (interference with housing rights by force or threat of force) to this case. They also challenge the court's limitation of their cross-examination of certain witnesses and the court's denial of their motion to dismiss the indictment on the basis of prosecutorial misconduct. We affirm the district court in all respects.

## I. Background

The events of this case occurred over the 1989 Labor Day weekend in Keeneyville, Illinois, a semirural, apparently close-knit and all-white community west of Chicago. Bob and Mary Jones, a white couple, rented a house in Keeneyville that they shared with their daughter, Pam, and son-in-law, Jad Rayan, both of whom are white. The Rayans had black friends who occasionally visited the house. Some of those friends visited the Rayans over the Labor Day weekend. During that holiday visit, the defendants burned crosses in front of the Joneses' house to underscore their dislike of blacks—or as they

James A. Shapiro, Asst. U.S. Atty. (argued), Barry R. Elden, Asst. U.S. Atty., Chicago, IL, for U.S.

---

* Honorable Robert L. Miller, Jr., District Judge for the Northern District of Indiana, is sitting by designation.

referred to them, "niggers" and "coons"—being in Keeneyville and staying with a white family.

Two crosses were burned that weekend. Krause, without Hayward (although Hayward knew about it) burned the first cross with the assistance of Thomas Miller and Steven Randall.[1] Early Sunday afternoon, Krause made the cross out of two pieces of two-by-four inch lumber, and Miller covered it with a flammable mixture he had made out of gasoline and petroleum jelly. The cross stood six and one-half feet high and was four and one-half feet wide. About 8:00 that evening, Krause, Miller, and Randall (all of whom had been drinking) carried the cross and a cement cinder block to the Joneses' house. They placed the cinder block at the edge of the Joneses' driveway and inserted the cross into the block. Krause attempted to light the cross, but could not because the gasoline had evaporated. He then ran back to the Randall house, where he was staying, got some gasoline, and returned. The men moved the cross a few feet up the driveway and doused it with the gasoline. Krause set the cross on fire and the men fled. A neighbor saw the burning cross and kicked it down.

Afterwards at the Randall house, Miller heard the sounds of a power saw and hammering coming from the direction of Hayward's house. Hayward, who was drunk, later arrived at the Randall house in his pickup truck. In the bed of the truck was a cross, larger than the first, approximately seven feet high, five feet wide, and built with two-by-six inch pieces of lumber. Hayward, Miller, and Krause removed the cross from the truck and drove to a nearby gasoline station to purchase diesel fuel to pour on the cross. Around midnight that same evening, the three men loaded the diesel-fuel soaked cross into the truck and drove to the Joneses' house, where they placed the cross into the same cinder block that held the first cross. Hayward lighted the cross, and the three men got into the truck and sped away.[2] While the cross burned in the driveway, a neighbor woke Pam Rayan. Rayan and her children saw the cross and were frightened. The neighbor telephoned the fire department because the burning cross threatened to set fire to a nearby tree. The police were also called.

The police investigation into who had burned the crosses made little progress. Most of those who knew about the crime, or were involved in it, were either related or good friends and refused to inculpate the defendants or themselves for that matter. A break occurred for the police more than a year later when Lynn Bardeleben, Krause's girlfriend, had an argument with Krause and subsequently told the police what she knew about the cross burnings. During the argument, Krause, who was drunk, hit Bardeleben and placed his .357 magnum handgun to her head. Unbeknownst to Bardeleben, the gun was unloaded. Krause pulled the trigger six times. He then cautioned her that she would be dead if she told the Federal Bureau of Investigation ("FBI") what she knew about the cross burnings. Bardeleben drove away from the apartment, but Krause followed her. When she arrived at a nearby police station, Krause blocked her egress from her car. Bardeleben began honking her car horn and Krause drove off.

Thereafter, the investigation into the cross burnings brought positive results for the government. An indictment was filed against the defendants, charging them each with conspiracy against civil rights, 18 U.S.C. § 241, use of fire to commit a federal felony, 18 U.S.C. § 844(h)(1), interference with housing rights by force or threat of force, 42 U.S.C. § 3631(b); aiding and abetting, 18 U.S.C. § 2, and use of a firearm to commit a violent crime, 18 U.S.C. § 924(c)(1). In addition, Krause was charged with threatening a witness (Bardeleben) in violation of 18 U.S.C. § 1512(b)(1). After a nine-day jury trial, Krause was convicted as charged. Hayward was convicted on all counts, except for the firearm charge. The defendants moved the district court for a judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial. They also moved the court to dismiss the indictment on the

---

1. Miller and Randall later cooperated with the government in exchange for being charged with misdemeanors, rather than with felonies, for their roles in the cross burnings.

2. Miller testified that as they drove away Hayward fired a small caliber handgun five or six times at the house. The jury acquitted Hayward of this act.

ground of prosecutorial misconduct. The court denied their motions. The court sentenced Krause and Hayward respectively to 153 months and 78 months in prison. This timely appeal followed.

## II. Analysis

The defendants raise four points on appeal. First, whether the district court misapplied to this cross burning case 18 U.S.C. § 844(h)(1), which punishes the use of fire or an explosive to commit any federal felony. Second, whether the district court's application of 42 U.S.C. § 3631(b) to this case violated the defendants' First Amendment right to burn the crosses as a matter of free speech. Third, whether the district court abused its discretion in limiting the defendants' cross-examination of certain witnesses. Fourth, whether the district court erred in denying the defendants' post-trial motion to dismiss the indictment on the basis of prosecutorial misconduct.

### A. 18 U.S.C. § 844(h)(1)

■ In their first point on appeal, the defendants contend the district court erred in applying 18 U.S.C. § 844(h)(1) to this cross burning case. Section 844(h)(1) states: "Whoever ... uses *fire* or an explosive *to commit any felony* which may be prosecuted in a court of the United States ... shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for five years [to run consecutively to the punishment received for the predicate felony]." 18 U.S.C. § 844(h)(1) (emphasis added). In this case, the predicate felony was 18 U.S.C. § 241, conspiracy to violate another's civil rights.[3]

The defendants maintain that section 844(h)(1) does not apply to this case because Congress intended the statute only for the prosecution of arson cases. Although the

defendants acknowledge that the plain wording of the statute could apply here, they insist that we should construe the language to give effect to the intent of Congress. To accomplish this bypass of the plain meaning of the statute, the defendants urge us to look solely at the legislative history, which they claim focuses only on arson-type offenses.[4] We decline, however, to invert the process of statutory analysis, and we instead look to the wording of the statute itself to discern Congress's purpose in promulgating section 844(h)(1).

■ A court's starting point to determine the intent of Congress is the language of the statute itself, *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1326 (7th Cir.1990), because the best method of discerning congressional intent is to examine the words Congress used in the statute. *See Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir.1987). "Where a word or a phrase has not been otherwise defined in a statute [as is the case in section 844(h)(1) with the word "fire"], a court should give it its plain and ordinary meaning." *Bailey v. City of Lawrence*, 972 F.2d 1447, 1451 (7th Cir.1992).

■ A court looks past "the express language of a statute only where that statutory language is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme." *United States v. 916 Douglas Ave.*, 903 F.2d 490, 492 (7th Cir.1990), *cert. denied*, 498 U.S. 1126, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991). In contrast, when the language of a statute is clear and unambiguous, no need exists for the court to examine the legislative history, and the court must give effect to the plain meaning of the statute. *E.g., Bethlehem Steel Corp.*, 918 F.2d at 1326; *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 548 (7th Cir.1988); *Meredith*, 833 F.2d at 654. Along with looking at the language of

---

**3.** Section 241 states in pertinent part:

If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

....

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both;

and if death results, they shall be subject to imprisonment for any term of years or for life.

18 U.S.C. § 241.

**4.** The legislative history the defendants rely on appears at 128 Cong.Rec. 18814–17, 24608–10 (1982) and House Report No. 678, 97th Cong., 2d Sess. 1–5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2631–35. *See also United States v. Fiore*, 821 F.2d 127, 131–32 (2d Cir.1987) (reproducing the relevant legislative history).

the statute section in question, part of a court's analysis includes examining the language and design of the statute as a whole. *E.g., K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988).

### 1. Examination of Section 844(h)(1).

Our reading of section 844(h)(1) leads us to conclude that the intent of Congress is clearly expressed in the language of the statute. Section 844(h)(1) states in simple, clear terms that "[w]hoever ... uses *fire* or an explosive *to commit any felony* which may be prosecuted in a court of the United States ... shall ... be sentenced to imprisonment for five years...." 18 U.S.C. § 844(h)(1) (emphasis added). The language of the statute does not limit itself to the prosecution of arson cases, as the defendants urge us to conclude. Had Congress wanted to so limit the statute, it could have easily inserted the word "arson" into the statute. *See Smith v. United States,* — U.S. ——, ——, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993). For example, Congress could have drafted the statute to read: Whoever uses fire or an explosive to commit *any arson* which may be prosecuted in a court of the United States shall be sentenced to imprisonment for five years. Congress chose not to do so. Instead, Congress chose to punish those who use *fire to commit any felony.* That dictate applies to the facts of this case. The defendants used fire to burn two crosses in order to commit the felony of violating the civil rights of the inhabitants of the house. 18 U.S.C. § 241. Accordingly, we find the language of section 844(h)(1) to be clear and unambiguous and the statute applicable to the facts of this case. *Cf. United States v. Worthy,* 915 F.2d 1514, 1516–17 (11th Cir. 1990) (holding that pre–1990 Sentencing Guidelines section 2K1.4(b)(4)—use of fire or explosives to commit a federal felony—is not

restricted to arson crimes and applies to cross burnings designed to interfere with another's civil rights); *accord United States v. Gresser,* 935 F.2d 96, 102–03 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 239, 116 L.Ed.2d 195 (1991).

■ The defendants insist, however, that the application of section 844(h)(1) to this case causes an absurd result.[5] For that characterization to apply, the application here would have to be so outlandish that Congress could not have intended it. This statute does not reach that difficult standard. Put another way, "[a] straightforward reading of [section 844(h)(1) ] does not produce a result so absurd or glaringly unjust as to raise a reasonable doubt about Congress's intent." *Chapman v. United States,* — U.S. ——, —— ——, 111 S.Ct. 1919, 1926–27, 114 L.Ed.2d 524 (1991) (citations and internal quotation marks omitted). The language Congress used in section 844(h)(1) shows that Congress intended to punish those who use *fire to commit any felony.* That is exactly what the defendants did in this case. Hence, the application of the statute here does not cause an absurd result.[6]

To underscore their point that to avoid an absurd result section 844(h)(1) must apply only to arson cases, the defendants provide us with the example of a person who commits the theft of an interstate shipment. They posit that if the thief uses a "Bic" lighter as a light source to help him insert the key into the lock of the truck he wants to steal, section 844(h)(1) could be applied, thus causing an absurd result. But there is a significant difference between using fire simply to *commit* a felony and using fire to *facilitate* or *assist* in the commission of a felony. Fire from the "Bic" lighter facilitates or assists in the commission of the crime of interstate theft. That is not the same as using fire to

---

5. We note that in cases dealing with a cross burning in front of a person's house, such as occurred here, the government's common practice is to charge the defendant under § 844(h)(1) as well as under 18 U.S.C. § 241 and 42 U.S.C. § 3631, as it did in this case. *E.g., United States v. Gresser,* 935 F.2d 96, 98 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 239, 116 L.Ed.2d 195 (1991); *United States v. Long,* 935 F.2d 1207, 1209 (11th Cir.1991); *United States v. Skillman,* 922 F.2d 1370, 1371 (9th Cir.1990), *cert. dismissed,* — U.S.——, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991); *United States v. Salyer,* 893 F.2d 113,

114 (6th Cir.1989); *Munger v. United States,* 827 F.Supp. 100, 101 (N.D.N.Y.1992).

6. Indeed, although one could argue that the application of the five-year mandatory penalty of § 844(h)(1) to the defendants' crime is stern, "[t]he remedy for any dissatisfaction with the results in [this case] lies with Congress and not with this Court. Congress may amend the statute; we may not." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3253, 73 L.Ed.2d 973 (1982).

commit a felony, in this case conspiracy against rights through threat or intimidation. Using the lighter to illuminate a keyhole is no different from illuminating the keyhole with a flashlight. Illuminating a wooden cross, however, with a flashlight or a floodlight is completely different from illuminating the cross by setting it on fire. The fire is an integral part of the threat or intimidation. One cannot reasonably argue that merely erecting a wooden cross, whether illuminated by a floodlight or not, on someone's driveway has the same effect as setting the cross on fire. The intimidation or threat does not stem from the fact that a wooden cross—by itself—is placed outside one's home. The intimidation stems from the flames emanating from the cross. By burning two crosses, the defendants *used fire to commit* the felony of conspiracy to violate the civil rights of those in the Jones household. The fire did not simply *facilitate* or *assist* them in the commission of their crime.[7]

Moreover, an examination of the language and design of section 844 supports our conclusion that section 844(h)(1) is not restricted solely to arson cases. *See K Mart Corp.,* 486 U.S. at 291, 108 S.Ct. at 1817. Section 844 is a penalties statute fashioned to punish the illegal use of fire or explosives. In drafting the statute, Congress placed section 844(i), the federal arson statute, immediately after section 844(h). Section 844(i) provides in part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both....

18 U.S.C. § 844(i). If Congress had intended section 844(h)(1) to apply only to arson

cases, as the defendants maintain, then no need would exist for section 844(i) and vice versa. Surely Congress did not intend to duplicate section 844(h)(1) with section 844(i). Instead, section 844(h)(1) applies to anyone who uses *fire to commit any felony* and is not limited just to arson cases. *See Freytag v. C.I.R.,* — U.S. —, —, 111 S.Ct. 2631, 2638, 115 L.Ed.2d 764 (1991) (noting that courts should have "'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment'"); *see also United States v. Roy,* 830 F.2d 628, 634 (7th Cir.1987) (stating that in construing a legislative enactment, "we presume that the legislature intended that each section was a necessary component of the statutory scheme and not surplusage"), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988). *Compare United States v. Fiore,* 821 F.2d 127, 130–32 (2d Cir.1987) (holding that sections 844(h)(1) and 844(i) are not multiplicitous) *with United States v. Chaney,* 559 F.2d 1094, 1096 (7th Cir.1977) (holding that the pre–1982 amended version of section 844(h)(1) and section 844(i) cannot be charged in the same indictment when identical evidence is used to prove both); *see also United States v. Karlic,* 997 F.2d 564, 571 (9th Cir.1993) (discussing *Fiore* and *Chaney*). As such, we conclude that the language and design of section 844 as a whole is consistent with the charge and conviction under the facts of this case.

*2. Rule of Lenity.*

 The defendants further suggest that section 844(h)(1) is at least ambiguous and, thus, we should apply the rule of lenity and look past the language of the statute and to its legislative history. We disagree. The rule of lenity "is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of [a statute] such that even after a court has seize[d] every thing from which aid can be derived it is still

---

**7.** No doubt, a reasonable argument could be made that had Congress intended § 844(h)(1) to apply to the example the defendants' offer, Congress would have inserted language into the statute to prohibit the use of fire, not only to commit a felony, but *to facilitate the commission* of a felony. *Cf.* 21 U.S.C. § 881(a)(7) (real property forfeiture). In the same vein, Congress, if it so chose, could have proscribed the use of fire *during* the commission of a felony by inserting the

appropriate language into § 844(h)(1). *Cf.* 18 U.S.C. § 844(h)(2) (prohibiting the carrying of an explosive during the commission of any federal felony). We pass no judgment on whether the government could prosecute a person under § 844(h)(1) based on the very limited facts the defendants set forth in their interstate shipment theft hypothetical. The government has discretion in how it charges people alleged to have committed federal crimes.

left with an ambiguous statute." *Chapman*, — U.S. at ——, 111 S.Ct. at 1926 (citations and internal quotation marks omitted). The language in section 844(h)(1) is clear and unambiguous. Therefore, we do not need to examine the legislative history of the statute. *916 Douglas Ave.*, 903 F.2d at 492; *see also, e.g., U.S.E.P.A. v. Environmental Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *Continental Can Co. v. Chicago Truck Drivers*, 916 F.2d 1154, 1160 (7th Cir.1990) (Flaum, J., concurring). To examine the legislative history in this case, and, thereby, apply the rule of lenity, would require us to contrive or manufacture some ambiguity, which is clearly inappropriate. *See Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *United States v. Marshall*, 908 F.2d 1312, 1318 (7th Cir.1990) (en banc), *aff'd*, — U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

### 3. Eighth Circuit Caselaw.

The defendants rely chiefly on an Eighth Circuit case to support their position that section 844(h)(1) does not apply to this case. In *United States v. Lee*, 935 F.2d 952 (8th Cir.1991), the court addressed the applicability of section 844(h)(1) to nondestructive cross burning cases and found the statute inapplicable. *Id.* at 958. In a one-paragraph analysis, the court looked first to the legislative history of section 844(h)(1) instead of to the language of the statute to discern congressional intent. Based on its reading of the legislative history, the court determined that section 844(h)(1) was meant to apply only to arson cases. *Id.*

Yet, as the district court in our case rightly observed, the *Lee* court's approach "puts the cart before the horse." *United States v. Hayward*, 772 F.Supp. 399, 402 (N.D.Ill. 1991). Rather than initially examining the statutory language to determine whether it

was ambiguous, unclear, or would have led to an absurd result, the *Lee* court began with the legislative history of section 844(h)(1). Its reliance on the legislative history, in place of the plain and clear meaning of the statute, caused it to have to "guess" whether Congress intended section 844(h)(1) to apply to cross burning cases. *Lee*, 935 F.2d at 958. Such an approach runs counter to the traditional method of statutory construction: "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan v. United States*, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961). Consulting legislative history is intended to resolve ambiguities that arise from the language of a statute; it is not intended to create ambiguities. *See Bifulco*, 447 U.S. at 387, 100 S.Ct. at 2252; *Callanan*, 364 U.S. at 596, 81 S.Ct. at 326. Thus, because the *Lee* court bypassed the clear and unambiguous language of section 844(h)(1), we reject its determination that section 844(h)(1) does not apply to cross burnings done to violate another's civil rights under 18 U.S.C. § 241.[8]

### 4. Summary.

■ We hold that section 844(h)(1) is clear and unambiguous. It provides a mandatory five-year prison term for anyone who has been convicted of using *fire* or an explosive *to commit any felony* and is not limited just to arson cases. Further, the application of section 844(h)(1) to cross burnings designed to violate a person's civil rights is not absurd and does not frustrate the overall statutory scheme of section 844. No need, therefore, exists for us to examine the legislative history to determine Congress's intent. Congress's intent is clear from the words it chose to include in section 844(h)(1).[9] *See Central*

---

**8.** Because of the conflict with the Eighth Circuit's decision in *Lee*, we have circulated this opinion to the entire court pursuant to Seventh Circuit Rule 40(f). A majority of judges in active service voted not to rehear this case *en banc*. (Judge Cudahy voted to rehear this case *en banc*.)

**9.** The defendants also argue for the first time on appeal that

> [t]he offense of 18 U.S.C. § 844(h)(1) requires the defendant to use fire in the commission of

another federal felony. Since the federal felony of conspiracy, under 18 U.S.C. § 241, is complete at the time that the agreement is made, the use of fire in the case at bar gives no vitality to the commission of the conspiracy. The fire was not an aid in formulating the agreement.

The defendants have waived this argument because they did not present it to the district court. *E.g., Textile Banking Co. v. Rentschler*, 657 F.2d

States v. Cullum Cos., 973 F.2d 1333, 1339 (7th Cir.1992); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Prods. Corp.*, 872 F.2d 208, 212–13 (7th Cir.), *cert. denied,* 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989).

### B. 42 U.S.C. § 3631(b)

■ In their second point on appeal, the defendants argue that cross burning is protected speech. They contend that the government unconstitutionally regulated their speech by prosecuting them under 42 U.S.C. § 3631(b), which they describe as a "content-based regulation" that is not narrowly tailored to achieve any compelling governmental interest. Hence, they maintain that the district court erred in applying the statute to this case.

Section 3631, which is part of the Fair Housing Act, 42 U.S.C. §§ 3601–3631, is a federal misdemeanor statute that states in part:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
>
> (a) any person because of his race, color, religion, sex, handicap ..., familial status ..., or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or
>
> (b) *any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—*
>
> *(1) participating, without discrimination on account of race, color, religion, sex, handicap ..., familial status ...,*

> *or national origin, in any of the activities, services, organizations or facilities described in subsection (a) of this section; or*
>
> *(2) affording another person or class of persons opportunity or protection so to participate....*
>
> ....
>
> shall be fined not more than $1,000, or imprisoned not more than one year, or both....

42 U.S.C. § 3631(a)–(b) (emphasis added).

#### 1. Expressive Conduct.

In determining whether section 3631(b) violates the defendants' First Amendment rights, we must first determine whether this type of cross burning is expressive conduct, giving the defendants a claim to First Amendment protection against their conviction. *Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 2538, 105 L.Ed.2d 342 (1989). Although the United States Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea," the Court has recognized "that conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 404, 109 S.Ct. at 2539 (citations and internal quotation marks omitted). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we [ask] whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974)).

■ In this case, the evidence showed that the defendants burned the crosses to tell

844, 853 (7th Cir.1981); *see also United States v. Hayward,* 764 F.Supp. 1305, 1306–08 (N.D.Ill. 1991) (denying the defendants' motion to dismiss). The defendants also contend that the imposition of the five-year mandatory penalty consecutive to the term of imprisonment for the predicate offense, § 241, is cruel and unusual

punishment and disproportionate to the cross burnings. Because they do not develop this argument beyond that mere assertion, we decline to consider it. *See, e.g., United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991).

those in the Jones household (and no doubt to anyone else who saw the burning crosses) that black people were unwelcome in Keeneyville and that association with blacks was not approved. Anyone who saw the burning crosses, especially those in the Jones household, was highly likely to understand their meaning. Indeed, a burning cross may provide different connotations to different people. Some would certainly view a burning cross, as "a precursor to physical violence and abuse against African–Americans and . . . an unmistakable symbol of hatred and violence based on virulent notions of racial supremacy." Charles H. Jones, *Proscribing Hate: Distinctions Between Criminal Harm and Protected Expression*, 18 Wm. Mitchell L.Rev. 935, 948 (1992). Inevitably the cross burnings here involved some degree of expressive conduct, albeit not absolutely protected conduct. *R.A.V. v. City of St. Paul,* — U.S. —, — & n. 1, —, —, 112 S.Ct. 2538, 2541 & n. 1, 2544, 2550, 120 L.Ed.2d 305 (1992) (stating that cross burning is expressive conduct that is not subject to total First Amendment protection and, therefore, may be punished under certain laws). No doubt, the defendants wanted to *express* their dislike, even hatred, of blacks through the cross burnings. But the act of cross burning also promotes fear, intimidation, and psychological injury. Therein lies the reason cross burning, as done in this case, lacks First Amendment protection. *See id.* at —, 112 S.Ct. at 2544 ("Non-verbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses."). Cloaking an act that portends violence with the guise of protected expression is nothing more than claiming that the First Amendment protects fighting words. *Id.* at —, 112 S.Ct. at 2545 ("Fighting words are thus analogous to a noisy sound truck . . . both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment."). Accordingly, some forms of expression, in this case cross burning used to intimidate, are harmful and damaging to others and, as such, do not enjoy the protecting cover of speech in the constitutional sense.

### 2. Extent of Governmental Regulation.

■ Because the cross burnings involved expressive conduct, we need to consider whether the government's regulation of that conduct was related to the suppression of free expression. *Johnson,* 491 U.S. at 403, 109 S.Ct. at 2538. If so, we apply a heightened standard of review. *Id.* If not, we apply the less stringent test announced in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *Id.*

■ The purpose of section 3631(b) is to protect the right of an individual to associate freely in his home with anyone, regardless of race. To achieve that end, the statute prohibits acts of willful intimidation against people based on race. The statute, then, is aimed at curtailing wrongful conduct in the form of threats or intimidation, and not toward curtailing any particular form of speech. *See Wisconsin v. Mitchell,* — U.S. —, —, 113 S.Ct. 2194, 2200–01, 124 L.Ed.2d 436 (1993). Consequently, because section 3631(b) is content-neutral, it does not directly regulate speech. As such, rather than a heightened standard of review, we employ the lesser standard enunciated in *O'Brien:*

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Under *O'Brien,* section 3631(b) qualifies as a sufficiently justified regulation.

Because section 3631(b) is part of the Fair Housing Act, its enactment was a proper exercise of the government's power under the Thirteenth Amendment to eradicate all incidents and badges of slavery.[10] *Williams*

10. The Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1982), originated at Title VIII of the

Civil Rights Act of 1968, Pub.L. No. 90–284, § 801 *et seq.,* 82 Stat. 81–89 (1968). The "Pre-

*v. Matthews Co.,* 499 F.2d 819, 825 (8th Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294, *and cert. denied,* 419 U.S. 1027, 95 S.Ct. 507, 42 L.Ed.2d 302 (1974); *see Norwood v. Harrison,* 413 U.S. 455, 470 & n. 10, 93 S.Ct. 2804, 2813 & n. 10, 37 L.Ed.2d 723 (1973). Also, section 3631(b) advances an important and substantial governmental interest by protecting a person's right to occupy a dwelling without fearing threats or intimidation based on race. We conclude that the statute is narrowly tailored to achieve that result. In this case, the statute did not proscribe cross burning as a form of expressive conduct. *Cf. R.A.V.,* — U.S. at —, —, 112 S.Ct. at 2541, 2547 (finding unconstitutional a statute that specifically proscribed cross burning, among other things); *Johnson,* 491 U.S. at 414, 109 S.Ct. at 2544 (noting that the "bedrock principle underlying the First Amendment ... is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Section 3631(b) prohibited the defendants' cross burnings because they willfully intended to threaten and intimidate those in the Jones household for entertaining black people in their home. *See United States v. Gilbert,* 813 F.2d 1523, 1529 (9th Cir.) (explaining that the requirement in section 3631 "of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech"), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987). The government's interest, then, in this case is unrelated to the suppression of free expression.

Finally, even though expressive speech may be involved in the proscribed conduct, that is insufficient to make section 3631(b) unconstitutional. As the Supreme Court stated in *R.A.V.,*

since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. Thus, for example, sexually derogatory "fighting words," among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices. *Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.*

*R.A.V.,* — U.S. at — – —, 112 S.Ct. at 2546–47 (emphasis added) (citations omitted); *see also Gilbert,* 813 F.2d at 1529 ("An illegal course of conduct is not protected by the first amendment merely because the conduct was in part carried out by language in contrast to direct action. If conduct contains both speech and non-speech elements, and if Congress has the authority to regulate the non-speech conduct, incidental restrictions on freedom of speech are not constitutionally invalid.") (citations omitted). Accordingly, we determine that any incidental restrictions on the alleged First Amendment rights in this case are no greater than is necessary to further the government's valid interest of protecting the rights of those in the Jones household to associate freely with whomever they choose.

*3. Summary.*

We hold that section 3631(b) regulates the wrongful conduct of threats and intimidation based on race and is content neutral on its face. *See also Gilbert,* 813 F.2d at 1528–31 (ruling section 3631(b) constitutional); *Munger v. United States,* 827 F.Supp. 100, 105 (N.D.N.Y.1992) (same). The application, therefore, of section 3631(b) to this case did

---

vention of Intimidation" section was attached to the civil rights legislation as Title IX and incorporated into the Fair Housing Act as section 901, 82 Stat. 89 (1968). The text of section 901, as codified and amended [appears] at 42 U.S.C. § 3631.

*United States v. Gilbert,* 813 F.2d 1523, 1526 (9th Cir.), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987).

not violate the defendants' First Amendment rights.

### C. Cross–Examination

In their third point on appeal, the defendants argue that the district court erred in curtailing the cross-examination of certain government witnesses. They maintain that the district court's actions prevented them from effectively impeaching those witnesses. "It is well-established that the Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross-examination." *United States v. Muhammad,* 928 F.2d 1461, 1466 (7th Cir.1991).

> The right to an opportunity for effective cross-examination, however, does not give defense counsel license to conduct the cross-examination as [he] chooses. A trial judge has broad discretion to impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness ... based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. Limitations on cross-examination do not interfere with the defendant's Sixth Amendment rights provided that cross-examination was sufficient to enable a jury to evaluate [the defendant's] theory of defense and to make a discriminating appraisal of the witness's motives and bias.

*Id.* at 1466–67 (citations and internal quotation marks omitted). "In order to determine whether the restrictions placed on the right to cross-examine a witness rise to the level of a constitutional deprivation, we 'look to the record as a whole ... and to the alternative means open to impeach the witness.'" *United States v. Cameron,* 814 F.2d 403, 406 (7th Cir.1987) (quoting *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 500–01 (7th Cir.1982), *cert. denied,* 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983) (citations omitted)). "We must resolve whether the restrictions that the court imposed on the defendant's cross-examination deprived the defense of a meaningful opportunity to elicit available, relevant information that was likely to effectively impeach the credibility of the witness." *Id.*

#### 1. Eviction Proceedings.

■■■ The defendants challenge the district court's grant of the government's motion *in limine,* precluding the defendants from cross-examining the occupants of the house about their pending eviction proceedings. The defendants assert that the testimony was necessary to show that the occupants left the house six months after the cross burnings because they were evicted and not because the cross burnings intimidated them to leave. The defendants maintain that the testimony regarding the eviction proceedings was relevant to show that the defendants burned the crosses, not out of racial animus, but to cause the "constructive eviction" of the tenants.

The district court did not abuse its discretion in finding the testimony regarding the eviction proceedings irrelevant. The fact that the tenants were later evicted from the house had nothing to do with the charges at hand. The main question in this case was whether the defendants intended to intimidate the victims, not whether the victims were actually intimidated. 18 U.S.C. § 241; 42 U.S.C. § 3631(b). Evidence of the victims' state of mind would tell us little, if anything, about the defendants' state of mind in burning the crosses. Without doubt, the evidence at trial showed that the defendants burned the crosses to intimidate the tenants and to interfere with their right to associate freely in their home with people of another race. Both Hayward and Krause had stated before the cross burnings that they disliked the idea of black people (in their words, "niggers" and "coons") coming into Keeneyville. In particular, Robert Pauley testified that Hayward warned him about a "nigger" living in the house Pauley had rented to the Jones family. And, Steven Randall testified that Krause had invited him to participate in the first cross burning, because "there was a nigger living with a white bitch, and [Krause] didn't like the idea, in Keeneyville."

Consequently, because the government did not have to show that the tenants left the house as a result of the cross burnings, the testimony regarding their eviction proceedings was irrelevant to the charges the government brought against the defendants. The district court, therefore, did not abuse its discretion in ruling on this matter. *See Muhammad,* 928 F.2d at 1466–67.

### 2. *Thomas Miller.*

■ The defendants next challenge the district court's grant of the government's motion *in limine* to curtail the cross-examination of Thomas Miller. Miller had a prior state-court misdemeanor conviction for unlawful use of a weapon for which he was placed on state-court supervision for one year. The supervision was subject to revocation in the event Miller was convicted of another crime. The defendants assert that the government did not file a petition to revoke the supervision, even though Miller had pleaded guilty to a federal misdemeanor for his role in the cross burnings. Had a petition been filed, the defendants contend that Miller would have faced a one-year state prison term. They claim Miller anticipated a benefit from the government in the form of the government not notifying the state about his federal misdemeanor conviction. As such, the defendants argue that they should have been able to question Miller on this point during cross-examination to challenge his credibility, motivation, interest, and bias.

■ The district court did not err in prohibiting the defendants from asking Miller about his prior state-court conviction. As the district court properly noted, "the prior conviction could not have been introduced for purposes of attacking credibility because the conviction was a misdemeanor offense that did not involve dishonesty or false statement." *Hayward,* 772 F.Supp. at 404 (citing Federal Rule of Evidence 609(a)).

■ Furthermore, the district court did not abuse its discretion in ruling at trial that the testimony was inadmissible under Rule 403 of the Federal Rules of Evidence. The court found that the testimony had low probative value, that its prejudicial impact was great, and that it could confuse and mislead the jury. Granted, Miller was facing a possible one-year prison term for violating his supervision, but he faced eighteen years in jail for his role in the two cross burnings had he not cooperated with the government. Even if Miller expected the government not to tell the state about his federal conviction, that information would have had limited probative value when weighed against the real benefit Miller received from the government: not being charged with a federal felony in exchange for his agreement to testify against the defendants.

Also, as the district court pointed out, Miller's federal conviction was not a secret. It was part of the public record. *Hayward,* 772 F.Supp. at 404. Consequently, Miller was not completely protected from having his supervision revoked, even if the government had promised not to file a petition with the state. (The record does not demonstrate that the government made any such promise to Miller.) Thus, the district court rightly found at trial that Miller would not have been motivated to lie during his testimony to defeat a revocation of his supervision. If he did not cooperate with the government, he would have faced many years in a federal prison. If Miller were to lie in favor of the government, it would have been to prevent serving time for the federal felony charges, rather than to prevent serving one year for violating his state-court supervision. *Cf. Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

Significantly, the defendants had the opportunity during cross-examination to ask Miller about the deal he had made with the government to testify against the defendants to avoid being charged with a federal felony. The court also allowed the defendants to explore during cross-examination Miller's history of lying to law enforcement authorities during their investigation of this crime. Equally important, the defendants were able to question Miller about his testimony that he was prejudiced against black people. And, they were able to question him about his attendance at a Halloween party shortly after the cross burnings, at which he wore blackface makeup and dressed as the Buckwheat character from the "Little Rascals"

movies. Around his neck was a rope tied as a noose. Richard Randall, donning a Ku Klux Klan outfit, accompanied Miller to the party and held the end of the rope that was around Miller's neck.

Because Miller took part in both cross burnings, he was a crucial government witness, whose testimony probably harmed the defendants the most. Realizing the damage Miller could do to their case, the defendants sought on cross-examination (and during their argument to the jury) to convince the jury that it was not them, but Miller who was behind the two cross burnings. They also attempted to show the jury that Miller was a bald-faced liar and that he had made an arrangement with the government to save himself to the detriment of the defendants.

We conclude that the leeway the district court gave the defendants on cross-examination was sufficient to allow the jury to evaluate the defendants' theory of defense as well as to permit the defendants sufficient opportunities to bring the value of Miller's testimony into doubt. *See Muhammad*, 928 F.2d at 1467; *Cameron*, 814 F.2d at 406. Based on the testimony the jury heard during Miller's cross-examination, we cannot say that the jury might have had a significantly different impression of Miller's credibility, bias, interest, or motivation had they heard him testify about his state-court supervision. *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436; *cf. Davis v. Alaska*, 415 U.S. 308, 317–20, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974). Accordingly, we conclude that the district court did not abuse its discretion in preventing the defendants from asking Miller about his prior state-court misdemeanor conviction. "[T]he Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross-examination." *Muhammad*, 928 F.2d at 1466.

### 3. Richard Lawler.

The defendants also contend that the district court erred in granting the government's motion *in limine* regarding the cross-examination of Richard Lawler. They wanted Lawler to testify about how badly the government had treated him before his grand jury testimony in order for the jury to have understood Lawler's state of mind during that testimony. The defendants also maintained that this evidence would have enabled the jury to have better judged Lawler's credibility during his trial testimony. At trial, the defendants made the following offer of proof, drawn from Lawler's colloquy with the defense during its pretrial investigation:

Question [by defense]: Did you have occasion to be debriefed or spoken to at all before you went in to the grand jury?

Answer [by Lawler]: Yes, I did.

Question: Who was in the grand jury besides yourself?

Answer: Don Glanzer and the Washington agent.

Question: What did they say to you at this time?

Answer: They told me I had better start telling the truth or I'm going to f[---]ing jail, and then I told them I was telling the truth. Then they sort of stood up in front of me and said, "You're a f[---]ing liar, and get your f[---]ing lawyer in here right now because you're going to f[---]ing jail.

Question: Was it Glanzer who said that or that Washington guy?

Answer: I think the Washington guy was the one doing that in there.

Question: Was he introduced as a U.S. Attorney from Washington, an FBI agent, or what?

Answer: I think he was a U.S. Attorney.

We find no error in the district court's ruling to exclude the testimony regarding the alleged threats made to Lawler. The jury had already heard Lawler, a hostile albeit insignificant[11] witness, testify on direct examination that an Assistant United States Attorney ("AUSA") had threatened him with jail prior to his testimony before the grand jury. Such testimony was sufficient to raise any doubts in the minds of the jury members about Lawler's credibility or state of mind,

---

11. In the district court's opinion, Lawler's testimony did not hurt the defendants' case. The court did not understand why the government called Lawler as a witness, except maybe to preclude a missing witness instruction.

without having Lawler testify about the profanity the AUSA had allegedly used with him. Such a matter, as the district court correctly pointed out to the defendants, was better suited for the court to consider, after the verdict, on a motion to dismiss the indictment based on prosecutorial misconduct: "Any broader inquiry into the existence of prosecutorial misconduct was not the province of the jury, but was more properly left to the court to be decided as a matter of law." *Hayward,* 772 F.Supp. at 404 (citing *United States v. Swiatek,* 819 F.2d 721, 726 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987)). The court also properly instructed the jury members "that they could consider questions and comments made by defendants' attorneys pertaining to alleged governmental misconduct to the extent that the material bore on the credibility of witnesses." *Id.* Thus, the district court did not abuse its discretion in curtailing the cross-examination of Lawler. *See Muhammad,* 928 F.2d at 1466–67.

### 4. Donald Glanzer.

The defendants further contend that the district court erred in curtailing the cross-examination of FBI Agent Donald Glanzer. The defendants maintain they were prejudiced because Agent Glanzer testified on direct examination that during his interrogation of Jeffrey Remick (a witness who testified against the defendants) Remick began to cry and told Agent Glanzer he was fearful the defendants and their friends would harm him if he testified against the defendants. The defendants argue that the district court prevented them from curing any prejudice stemming from Agent Glanzer's testimony. Specifically, they assert that the court denied them the opportunity of asking Agent Glanzer on cross-examination whether any of the other twenty-five witnesses he had interviewed in this case had ever stated that the defendants, in particular Hayward, had threatened them.

The district court did not err. The propriety of the court's decision to preclude cross-examination is obvious when the sequence of events is examined. After Agent Glanzer testified on direct examination about Rem-

ick's statement, the defendants objected and moved for a mistrial. The court denied the motion and then instructed the jury to consider Agent Glanzer's testimony regarding Remick not for the truth of the matter asserted, but for the sole purpose of determining Remick's state of mind at the time he made the statement. (These court rulings are not on appeal.)

The defendants then cross-examined Agent Glanzer. During this first cross-examination, the defendants did not ask or seek to ask questions about the twenty-five witnesses Agent Glanzer had interviewed. The government then proceeded with a redirect examination of Agent Glanzer, and the defendants had the opportunity to examine him again on recross. The threats made to Remick and Agent Glanzer's dealings with the other twenty-five witnesses were not mentioned either on redirect or on recross. The government then conducted a second redirect examination of Agent Glanzer. The questions and answers during this second redirect examination had nothing to do either with Remick's claims that the defendants had threatened him or with Agent Glanzer's dealings with the other witnesses. Nevertheless, on their second recross-examination, the defendants sought to ask Agent Glanzer questions about the threats and about his interviews with the other witnesses. The district court denied the defendants the chance to ask those questions, because the questions had no relevance to the preceding redirect examination. Consequently, we determine that the district court did not abuse its discretion in making its ruling. The defendants were restricted on their second recross-examination to asking Agent Glanzer questions that were within the scope of the questions the government had asked him on its second redirect examination. *See* Fed.R.Evid. 611(b); *United States v. Burrell,* 963 F.2d 976, 997 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992).

### 5. Summary.

We conclude that the district court did not abuse its discretion in making its evidentiary rulings. No Sixth Amendment violations took place. The restrictions the court placed

on the defendants' cross-examination of the witnesses did not deprive them of a meaningful opportunity to elicit relevant information that was likely to impeach the credibility of the witnesses or show their bias, interest, or motivation. *See Muhammad,* 928 F.2d at 1466–67; *Cameron,* 814 F.2d at 406.

## D. Prosecutorial Misconduct

In the defendants fourth and final point on appeal, they claim the district court erred in not dismissing the indictment on the ground of prosecutorial misconduct. The defendants contend the government threatened four witnesses, who had testified against the defendants, with perjury prosecutions unless they told the truth. The defendants also maintain that the government used abusive and profane language toward two of those witnesses. According to the defendants, the government's conduct could have reasonably caused the witnesses to have conformed their testimony to support the government's position, thus violating the defendants' due process rights.

As this court has made clear, "due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be *truly outrageous* before due process will prevent conviction of the defendant." *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983) (emphasis added). We note that this circuit has questioned the validity of the doctrine of outrageous government conduct and has yet to overturn a conviction on that ground. *E.g., United States v. Olson,* 978 F.2d 1472, 1481 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); *United States v. Miller,* 891 F.2d 1265, 1267 (7th Cir.1989).

### 1. Alleged Wrongful Conduct.

 The alleged prosecutorial misconduct took place with the following witnesses: Richard Lawler, Scott Haga, Thomas Hagen, and Jeffrey Remick. The defendants contend that an AUSA told Richard Lawler before he testified to the grand jury that he was a "f---ing liar" and that unless he told the truth he was going to "f---ing jail." The defendants maintain that an FBI agent told Scott Haga, in front of Haga's five-year old son, that Haga would be sentenced to five years in jail for perjury unless he testified truthfully. With regard to Thomas Hagen, the defendants assert that an FBI agent told him he would go to jail unless he told the truth during his testimony. Lastly, the defendants contend that two AUSAs yelled at Jeffrey Remick before he testified to the grand jury. They claim the AUSAs told Remick to "shut the f--- up," called him "a smart ass punk" and a "motherf---er," and said he was a "f---ing liar," who would go to jail for five years if he perjured himself and that he would make the inmates in prison a "nice girlfriend."

The government denies using any profanity with Remick, except that one of the AUSAs told him to "shut the f--- up" when he refused to quit yelling and using coarse language. The government is silent about its use of profane language with Lawler. The government further denies that anyone told Remick that he would have made another inmate a "nice girlfriend." The government concedes, however, that it applied pressure on the witnesses to tell the truth, because those witnesses were recalcitrant at first about talking to the government, about inculpating the defendants, or even about telling the truth during their testimony. But, the government underscores that each of the four witnesses did testify truthfully and, as such, the tactics it used did not prejudice the defendants in any way.

### 2. Conduct Not Outrageous.

We conclude that the facts of this case do not demonstrate prosecutorial misconduct on behalf of the government. The alleged conduct was not so outrageous that it violated the defendants' due process rights. *Miller,* 891 F.2d at 1267; *Kaminski,* 703 F.2d at 1009. Although we do not condone the government's use of profanity with any witness, the record before us does not support the conclusion that the government used such outrageous language with the witnesses that a dismissal of the indictment would be warranted. In addition, nothing in the record

indicates that any of the four witnesses lied while testifying, or that the government told them to lie. On the contrary, the evidence shows that they each told the truth during their testimony.

Granted, the government told the witnesses that they had to testify truthfully and, if not, they would go to jail. That procedure, however, even if carried out in a caustic manner, is no cause to dismiss the indictment against the defendants. *See United States v. Holloway,* 778 F.2d 653, 655 (11th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719, *and cert. denied,* 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 720 (1986). As the district court properly noted, "[t]here is nothing wrong with the government informing witnesses of the consequences of breaking the law." *Hayward,* 772 F.Supp. at 406 (citing *Holloway,* 778 F.2d at 657); *see also United States v. Viera,* 839 F.2d 1113, 1115 (5th Cir.1988) ("A prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct.").

Moreover, in this case, the government was faced with trying to solve a crime that took place in a small, close-knit community. Most of the people involved in the crime, or who knew about it, were either related or had known each other for many years. As would be expected, the government initially came up against a wall of silence and a labyrinth of lies in its investigation of this crime. In that regard, the government was justified in applying lawful pressure on the witnesses to convince them that they had to testify truthfully. *See United States v. Bounos,* 730 F.2d 468, 470 (7th Cir.1984) (" '[I]n evaluating whether government conduct is outrageous the court must consider the nature of the crime and the tools available to law enforcement officers to combat it.' ") (quoting *United States v. Twigg,* 588 F.2d 373, 378 n. 6 (3d Cir.1978)). As a result, we affirm the district court's denial of the defendant's motion to dismiss the indictment on the basis of prosecutorial misconduct.

### 3. Hayward's Bond and Detention.

Included within Hayward's contentions about prosecutorial misconduct, he makes a sparse argument that he was prejudiced

when, prior to his sentencing, the government held an *ex parte* proceeding before the district court and had his bond revoked on charges that he had attempted to bomb Thomas Hagen's truck. Hayward maintains that a defense investigation uncovered that another person had tried to bomb the truck. Even so, as the district court stated in response to this very argument:

> Hayward appears to be under the mistaken impression that the court detained him because of an incident involving Tom Hagen. In fact, the court's decision was based on Hayward's inability to rebut the presumption of detention in 18 U.S.C. § 3143(a)(2). Hayward failed to show that there was a substantial likelihood that he would succeed on a motion for acquittal or a motion for new trial. Since the court has again rejected Hayward's arguments in its denial of defendant's motion for acquittal or a new trial, the court finds no basis for reconsidering defendant Hayward's detention pending sentencing.

*Hayward,* 772 F.Supp. at 406–07; *see also United States v. Hayward,* 767 F.Supp. 928, 929–30 (N.D.Ill.1991) (granting the government's motion to detain Hayward pending sentencing). On appeal, Hayward has not alleged any facts to overcome the presumption of detention. The district court's reason, therefore, to detain him pending sentencing was adequate, and we find no error.

### III. Conclusion

The district court did not err with respect to any of the four points on appeal. The court properly applied 18 U.S.C. § 844(h)(1) and 42 U.S.C. § 3631(b) to this case. The court was also within its discretion to limit the cross-examination of certain witnesses, and the court correctly determined that the government's conduct toward some of the witnesses did not reach the level of prosecutorial misconduct. Likewise, the district court did not err in revoking Hayward's bond and in detaining him pending sentencing. Accordingly, the district court is AFFIRMED.

FLAUM, Circuit Judge, concurring.

I join the court's opinion as to its application of 18 U.S.C. § 844(h)(1) and concur in

the judgment as to its application of 42 U.S.C. § 3631. I write separately in order to express some additional thoughts about these statutes which were used to convict Hayward and Krause.

To begin with, I agree with the majority that under the prevailing rules of statutory construction, we are obliged to take 18 U.S.C. § 844(h)(1) at its word to enhance the punishment of any individual who "uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States." I am dubious about whether Congress intended cross burnings to fall under section 844(h)(1), which—the legislative history strongly indicates—was amended to include the word "fire" for the purpose of facilitating the prosecution of arson-related offenses. *See United States v. Lee*, 935 F.2d 952, 958 (8th Cir.), *vacated on other grounds, reh'g en banc granted in part* (Aug. 14, 1991); *cf.* John Panneton, *Federalizing Fires: The Evolving Federal Response to Arson Related Crimes*, 23 Am.Crim.L.Rev. 151 (1985) (describing the efforts of "creative prosecutors" to adapt federal statutes, including 18 U.S.C. § 844, to cover greater numbers of arson-related crimes). Nevertheless, since the plain meaning of the statute encompasses offenses of this type, I believe that its application to the facts of this case was not improper.

I also agree that it was proper to apply 42 U.S.C. § 3631 to the defendants' actions, but I would approach the question of that statute's constitutionality differently than the majority. In my view, determining how to apply the Supreme Court's recent decision in *R.A.V. v. City of St. Paul*, —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), a sharply divided 5–4 ruling, is a difficult matter. I conclude that although section 3631 and the ordinance under review in *R.A.V.* bear a superficial similarity, their internal structures differ in a crucial respect that requires us to uphold this law.

Section 3631, as the majority states, is part of the "Prevention of Intimidation" subchapter of the Fair Housing Act. The subsection applicable to this case punishes by misdemeanor any individual who "by force or threat of force willfully injures, intimidates or interferes with—.... any person because he is or has been, or in order to intimidate such person ... from—participating, without discrimination on account of race, color, religion, sex, handicap ..., familial status ..., or national origin" in the occupation of any dwelling. 42 U.S.C. § 3631(b). While section 3631(b) bans the use of pure force as a means of intimidation, this case involves the other activity that it proscribes: the making of threats.

A threat is made when the threatener informs the recipient of his threat that he is contemplating the infliction of some harm upon another, often the recipient himself. Either words or symbols may be the medium of a threat; as anyone familiar with our nation's history is aware, a burning cross is no less effective at communicating the intended message than are written or spoken words. Although threats have undeniable expressive content (indeed, speech qualifies as a threat by virtue of the message it expresses), the First Amendment poses no special obstacle to their prohibition. Threats interfere with the rights of individuals to be free from the fear of violence; they are disruptive and costly to society; and they usually contribute little or nothing to the marketplace of ideas. *See Rogers v. United States*, 422 U.S. 35, 46–47, 95 S.Ct. 2091, 2098, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring); *United States v. Velasquez*, 772 F.2d 1348, 1356–58 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). For that reason, one influential commentator has argued that the making of threats, like the use of speech to commit perjury or extortion, fix prices, place bets with bookies, and so on, falls entirely outside the coverage of the First Amendment's protection. *See* Frederick Schauer, *Categories and the First Amendment: A Play in Three Acts*, 34 Vand.L.Rev. 265, 267–82 (1981), cited in *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2563 (Stevens, J., concurring in the result).

Congress has passed numerous laws that proscribe threats. *See, e.g.*, 18 U.S.C. § 871 (threats against the president and successors to the presidency); *id.* § 876 (threats by mail to injure or kidnap); *id.* § 1513 (retaliatory

threats against informants and witnesses); *id.* § 115 (threats to assault, kidnap, or murder federal officials). These statutes have been consistently upheld as constitutional, despite the fact that they criminalize utterances because of their expressive content. *See Watts v. United States,* 394 U.S. 705, 707–08, 89 S.Ct. 1399, 1400–01, 22 L.Ed.2d 664 (1969) (per curiam) (holding that the First Amendment does not protect "true threats" against the President); *United States v. Varani,* 435 F.2d 758, 762 (6th Cir.1970) ("[S]peech is not protected when it is the very vehicle of the crime itself. *E.g.,* ... 18 U.S.C. §§ 871–877 (1964) ... (Extortion and Threats)."); *see also Boos v. Barry,* 485 U.S. 312, 326, 108 S.Ct. 1157, 1166, 99 L.Ed.2d 333 (1988) (commenting favorably on a law that prohibits activity undertaken to "intimidate, coerce, threaten, or harass").

To say that threats are proscribable, however, does not end the matter as to the constitutionality of section 3631. The controversial holding of *R.A.V. v. City of St. Paul* was that while an entire category of speech may be proscribable (obscenity or fighting words, for example), it may be impermissible to proscribe only a subset of that category if the subset is drawn along content-based lines. In *R.A.V.,* for example, the Court held that although it may be permissible to proscribe all fighting words, it is impermissible to proscribe only those fighting words that "arouse anger, alarm or resentment in others on the basis of race, color, creed, religion, or gender," as did St. Paul's Bias–Motivated Crime Ordinance, as construed by the Minnesota Supreme Court. The Court revised its long-standing view of fighting words, stating that they are not truly "categories of speech entirely invisible to the Constitution" as some earlier cases had held, and therefore they "may [not] be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2543. In the Court's view, singling out for proscrip-

tion speech that is "addressed to ... specified disfavored topics," even if those topics are communicated by means of fighting words, is an impermissible effort at censorship by the government. *See id.* at ——, 112 S.Ct. at 2547.

*R.A.V.* identified several limited exceptions to this overarching precept of content-neutrality. First, the Court explained, content-based distinctions may be drawn within a class of proscribable speech if the basis for the distinction is "the very reason the entire class is proscribable." The Court offered the following example, helpful for analysis of the present case.

> The federal government can criminalize only those threats of violence that are directed against the President, see 18 U.S.C. § 871—since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that violence will occur) have special force when applied to the person of the President. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).... But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities.

*Id.* at ——, 112 S.Ct. at 2546. Second, a content-defined subclass may be treated differently if the subclass is associated with "particular 'secondary effects' " of the speech, so that "the regulation is *'justified* without reference to the content of the speech.' " *Id.* (quoting *Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (quoting, with emphasis, *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976))). The Court included under this exception laws directed at conduct that "incidentally" sweep up a content-based subcategory of a proscribable class of speech.[1] Fi-

---

[1] I disagree with the majority's view that section 3631 falls under this exception. *R.A.V.* gives as examples a law against treason, which would be violated by telling the enemy the nation's defense secrets, and Title VII's prohibition of sexual discrimination in employment practices, which

might be violated by speaking sexually derogatory fighting words. Both of these are general laws that incidentally burden speech, therefore meriting treatment under the more permissive test of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Section

nally, the Court offered a "catch-all" exception that other bases for distinction may be valid, even if non-neutral, so long as "there is no realistic possibility that official suppression of ideas is afoot." *Id.* at ——, 112 S.Ct. at 2547.

Under the *R.A.V.* analysis, section 3631 seems functionally similar to St. Paul's Bias–Motivated Crime Ordinance. Like the ordinance, section 3631 selects a subclass of threats from the larger proscribable class of all threats apparently on the basis of the message conveyed—because they express hostility to the idea that blacks and whites should share housing together. It may be possible, however, to uphold section 3631 under the first of *R.A.V.*'s three limited exceptions. The reason threats are proscribable in the first place is the fear that they arouse in listeners; that fear, which one might frame as a "psychological injury," may be offered as a reason for regulating this subclass of threats that is unrelated to the suppression of speech. In their concurrences, several Justices argued that the St. Paul ordinance should be judged constitutional on precisely this reasoning. Borrowing the majority's example, Justice Stevens argued:

> Just as Congress may determine that threats against the President entail more severe consequences than other threats, so St. Paul's City Council may determine that threats based on the target's race, religion, or gender cause more severe harm to both the target and to society than other threats. This latter judgment—that harms caused by racial, religious, and gender-based invective are qualitatively different from that caused by other fighting words—seems eminently reasonable and realistic.

*Id.* at ——, 112 S.Ct. at 2565 (Stevens, J., concurring in the judgment); *see also id.* at

——, 112 S.Ct. at 2556 (White, J., concurring in the judgment) ("This selective regulation reflects the City's judgment that harms based on race, color, creed, religion, or gender are more pressing public concerns than the harms caused by other fighting words. In light of our Nation's long and painful experience with discrimination, this determination is plainly reasonable."); *id.* at ——, 112 S.Ct. at 2560–61 (Blackmun, J., concurring in the judgment).[2]

The same arguments could be raised in relation to section 3631. However, the *R.A.V.* majority specifically rejected the claim that the subclass of fighting words regulated by St. Paul—words that incite on the basis of race, color, creed, religion, or gender—could be singled out because of some special injury they cause. The Court maintained that it was "word-play" to say that the ordinance targeted particular harms caused by the speech, rather than the content of the speech itself. "What makes the anger, fear, sense of dishonor, etc. produced by violation of this ordinance distinct from the anger, fear, sense of dishonor, etc. produced by other fighting words is nothing other than the fact that it is caused by a distinctive idea, conveyed by a distinctive message. The First Amendment cannot be evaded that easily." *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2548. If the *R.A.V.* majority rejected the idea that fighting words—words that "by their very utterance inflict injury," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)—could be subcategorized along these lines in light of the greater harm caused by racist or sexist fighting words, then it would be unlikely to uphold a similar classification among threats—words that create a fear of violence—on the theory that

---

3631, on the other hand, regulates threats directly, not merely as an instance of some broader practice such as "treason" or "discrimination." *Cf. Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286 (2d Cir.1992) (applying *R.A.V.* to uphold state and federal antidiscrimination laws that were violated by defendants' efforts, some via speech, to make a resort facility breach its contract with the plaintiff organization).

2. In a penetrating analysis of the *R.A.V.* decision, Professor Akhil Amar argues that all of the opinions, majority and concurring, would have been enriched by consideration of how the Thirteenth and Fourteenth Amendments bear on the St. Paul ordinance. One might underscore the point in connection with the passages from the concurrences cited above. *See* Akhil Reed Amar, *The Supreme Court, 1991 Term—Comment: The Case of the Missing Amendments:* R.A.V. v. City of St. Paul, 106 Harv.L.Rev. 124 (1992).

threats targeted against individuals who share housing with members of minority groups cause greater fear or more severe disruption.

Since the crucial question is whether the statute regulates speech because of its content or message, however, there is an important dissimilarity in the structure of these two laws. The critical language in the St. Paul statute, unaffected by the Minnesota Supreme Court's gloss, is that speech is proscribed that insults or provokes violence *"on the basis* of race, color, creed, religion, or gender." Banning speech because of the type of reaction it would engender in the listener, the majority reasoned, necessarily requires an examination of the content of that speech. The ordinance thus attempted to control which messages could be communicated via fighting words. The "on the basis of" language by itself compels an examination of content.

Section 3631, on the other hand, forbids threats directed at an individual *"because* he is ... or *in order to* intimidate such person from" participating in the exercise of housing rights without discrimination. Section 3631 focuses neither on the content of the threat nor on the effect that it is likely to cause in the listener, but rather on the choice of victim or on the motive of the person making the threat. Indeed, the precise message of the threat does not determine whether section 3631 has been violated. There is no need to consider whether the victim is threatened with a violent act or some undefined harm (e.g., "Do what we want or else"); whether the threat is unconditional or is promised to occur "unless" the victim takes some action; or whether some particular idea (e.g., that blacks and whites should not live together) is expressed thereby. It may turn out, of course, that the wording of a written threat helps to determine whether the threat was made because the victim was participating in the protected activities, but the pur-

pose of the statute is not to ban communication of that message.

Although this distinction may seem illusory, it dovetails with a distinction drawn by the *R.A.V.* majority itself.

> What we have here, it must be emphasized, is not a prohibition of fighting words that are directed at certain persons or groups (which would be *facially* valid if it met the requirements of the Equal Protection Clause); but rather, a prohibition of fighting words that contain (as the Minnesota Supreme Court repeatedly emphasized) messages of "bias-motivated" hatred and in particular, as applied to this case, messages "based on virulent notions of racial supremacy." [*In re Welfare of R.A.V.,*] 464 N.W.2d [507], 508, 511 [(Minn.1991)].

*R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2548 (emphasis in original). This passage indicates that a legislature may select a group to protect specially from the harm of fighting words (or, by extension, threats), and pass legislation that prohibits individuals from using those forms of speech against them. An equivalent way to write such a law would be to focus on the perpetrator, rather than the speech itself, and to consider whether he chose his victims because they belong to the protected group.[3]

Justice Stevens argued that the majority had drawn a distinction without a difference, since the reason why a legislature would selectively proscribe speech aimed at certain persons or groups ("for example, a law proscribing threats against the elderly") would be its determination that the harm caused by the regulated expression differed from that caused by other unregulated expression ("the elderly are more severely injured by threats than are the nonelderly")—a justification that the majority had declared invalid because it was based on the message behind the words. *See id.* at ——, 112 S.Ct. at 2565 (Stevens, J., concurring in the judgment). There are other reasons to doubt whether it

---

3. This past Term, in *Wisconsin v. Mitchell,* —— U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), the Supreme Court upheld a Wisconsin statute that enhances the penalty for an offense if the offender intentionally selected his victim "because of the race, religion, color, disability, sexu-

al orientation, national origin or ancestry" of that person. The Court rebuffed the argument that the statute punishes bigoted thought. It did note, however, that the Wisconsin law aims at conduct—namely, violence—that, unlike speech, receives no First Amendment protection.

would be possible to prohibit speech that is "directed at certain persons or groups" without resorting to content discrimination. Fighting words or threats directed at certain persons or groups may be conceptualized in two ways. A threat worded "I plan to kill you" and mailed to an elderly person would fall under a prohibition on threats against the elderly (to borrow Justice Stevens' example) without any recourse to the content of the threat itself. On the other hand, a poster nailed onto someone's front door that contained a threatening diatribe against elderly people living in the community would violate the law only in light of its content, the idea it was trying to express. The point, of course, is that the choice of persons or groups targeted by a threat, whether stated explicitly in the threat or merely implied from the surrounding circumstances, is an essential component of the message that the threat means to communicate.

One may similarly question whether there is any constitutional difference between a prohibition on threats directed against those who entertain members of minority groups in their homes and a prohibition on threats that cause fear "on the basis of" someone's exercise of housing rights without discrimination. The constitutionality of a law ought not depend, it would seem, on which of two functionally equivalent ways it is written. In any case, I conclude that section 3631 draws permissible lines within the class of proscribable threats. While I hope that the court's ruling in this case does not bear out Justice White's fear that *R.A.V.* "will surely confuse the lower courts," *id.* at ——, 112 S.Ct. at 2560 (White, J., concurring in the judgment), I believe that the result it reaches is sound under that decision and under traditional First Amendment principles.