**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael NICHOLSON, Defendant.**

**No. 01–CR–152.**

United States District Court,
E.D. Wisconsin.

Jan. 25, 2002.

Brian E. Pawlak—Assistant U.S. Attorney, Barbara Bernstein—DOJ, Civil Rights Division, Washington, DC, for Plaintiff.

Leonard D. Kachinsky, Neenah, WI, for Defendant.

## ORDER

STADTMUELLER, Chief Judge.

On August 15, 2001, an eight-count indictment was handed-up charging Michael Nicholson with various civil-rights related offenses. Counts One, Two, and Three of the indictment relate to a July 28, 1998 arson of a home inhabited by an eight-member Asian family. Count One alleges that Nicholson and a co-conspirator carried out the arson in violation of 18 U.S.C. § 241, the civil rights conspiracy statute. Count Two charges Nicholson with violating 42 U.S.C. § 3631, the criminal provision of the Fair Housing Act which prohibits the intimidation of persons occupying a dwelling because of their race or color. Count Three charges Nicholson with using fire to commit Counts One and Two, in violation of 18 U.S.C. § 844(h)(1).

The indictment's remaining five counts relate to a scheme to lure Asian people from a household by use of explosives, with the plan to shoot the people as they emerged from the home. The indictment alleges that Nicholson, three co-defendants, and several unindicted co-conspirators participated in the scheme. Counts Four and Five are charged under the same statutes as Counts One and Two, alleging a civil rights conspiracy in violation of 18 U.S.C. § 241 and the interference with the housing rights of another in violation of 42 U.S.C. § 3631, respectively. Count Six charges Nicholson with using a firearm to commit Counts Four and Five, in violation of 18 U.S.C. § 924(c). Count Seven charges Nicholson with using a firearm and explosives to commit Counts Four and Five, in violation of 18 U.S.C. §§ 844(h)(1) and (2). Count Eight charges Nicholson with the illegal possession of a firearm in violation of 26 U.S.C. § 5861(d).

On September 12, 2001, Nicholson filed a motion to dismiss Counts One through Seven of the indictment, arguing that Congress, in passing 18 U.S.C. § 241 and 42 U.S.C. § 3631, exceeded the scope of its power under the Commerce Clause, U.S. CONST. art. I § 8, cl. 3, and the Thirteenth Amendment of the United States Constitution. On September 21, 2001, the government filed a responsive brief, asserting that the legislation was authorized under either constitutional provision.

Nicholson's motion was first considered by Magistrate Judge Patricia J. Gorence. After dealing with a number of pretrial filing delays, on October 23, 2001, Magistrate Gorence issued a recommendation to this court that Nicholson's motion to dismiss be denied.[1] The same day, Nicholson

---

1. Nicholson was indicted with three co-defendants, all of whom filed pretrial motions (the co-defendants have since pleaded guilty). Nicholson attempted to adopt these pretrial motions, *see* September 20, 2001 Magistrate Order Re: Defendant's Motions to Adopt; however, in the Magistrate's October 23, 2001 recommendation, she noted that Nicholson failed to state with specificity reason for doing so, as is required by Criminal L.R. 16.1(a). The magistrate reviewed Nicholson's motion nonetheless, and, in the interests of justice, this court does the same.

appeared before this court for a final pretrial conference. Nicholson's jury trial was scheduled to begin on October 29, 2001. Noting the pending trial, the court provided Nicholson an opportunity to review the recommendation and advise the court whether he wished to file an objection. On October 24, 2001, Nicholson notified the court by telephone that he indeed wished to object to the recommendation. Accordingly, the court granted Nicholson's oral request and removed the trial from the calendar. On October 31, 2001, Nicholson filed timely objections to the recommendation. The government filed a timely response on November 15, 2001. The court reviews the recommendation *de novo*. *See* 28 U.S.C. § 636(b)(1).

### I. COMMERCE CLAUSE

■ The Commerce Clause provides Congress with the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. Commerce power is broadly defined, describing the "commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons v. Ogden*, 22 U.S. 1, 9, 9 Wheat. 1, 189–190, 6 L.Ed. 23 (1824).

Such power does not come unrestrained. As with all enumerated powers found within the Constitution, the Commerce Clause is meant to strike "a healthy balance of power between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The court plays a key role in keeping this balance: when Congress passes a law using its Commerce Clause power, it becomes a function of the court to decide whether a "rational basis exist[s] for concluding that a regulated activity sufficiently affected interstate commerce." *United States v. Lopez*, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). If

a rational basis exists, the court's inquiry is at an end: "Due respect for the decisions of a coordinate branch of Government demands that [the court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *See United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

Until recent years, Congress' Commerce Clause power remained relatively unchallenged in the courts. "As a practical matter, at least since the watershed decisions of 1937–1942, the political process, and not the courts, has been the states' only real defense against commerce-based federal incursions." *United States v. Ramey*, 24 F.3d 602, 606 (4th Cir.1994)(footnoting the so-called watershed decisions found in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (upholding Wagner Act), *United States v. Darby*, 312 U.S. 100, 312 U.S. 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding prohibition on transportation in interstate commerce of products manufactured with child labor), *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942) (upholding regulation of sales of intrastate milk because such sales compete with "interstate" milk), and *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)(upholding amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat)).

That was until the landmark case of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), a case in which the Supreme Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A). The Supreme Court's analysis began by breaking down modern Commerce Clause jurisprudence into three broad categories of activity: 1) the use of channels of interstate com-

merce; 2) instrumentalities of interstate commerce and persons and things in interstate commerce; and 3) activities having a substantial relation to interstate commerce. *See Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624. The court reasoned that, within these categories, Congress had the power to regulate under the Commerce Clause. The court then focused its review on the third category of intercourse-whether an activity has a substantial relation to interstate commerce, once again turning to Commerce Clause jurisprudence. The court pointed out that, according to case law on the subject, a number of factors may be considered in identifying whether activity substantially affects interstate commerce: 1) whether activity to be regulated is economic in nature; 2) whether legislation contains a jurisdictional element linking it to commerce; 3) whether Congress, in considering legislation, made any findings concerning the legislation's effect upon interstate commerce; or 4) whether a link exists between the activity itself and interstate commerce. *See Lopez,* 514 U.S. at 559–67, 115 S.Ct. 1624. After applying the so-called "substantial affects" test, the Court concluded that the Gun–Free School Zones Act lacked a substantial relation to interstate commerce.

Five years after *Lopez,* the Supreme Court took the opportunity in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), to strike down another Congressional enactment, this time holding that Congress was without the authority under the Commerce Clause to pass the Violence Against Women Act of 1994 ("VAWA"), 42 U.S.C. 13981, a statute which provided a federal civil remedy for victims of gender-motivated violence. In doing so, the Court flushed out the "substantial affects" test. The Court placed a great deal of emphasis on whether the activity to be regulated was economic in nature: "*Lopez*'s review of Commerce Clause case law demonstrates

that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been *some sort of economic endeavor.*" *Morrison,* 529 U.S. at 611, 120 S.Ct. 1740 (emphasis added). At the same time, the Court made it clear that, when it comes to Congressional findings, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Id.* at 614, 120 S.Ct. 1740. This is particularly so when Congressional findings in support of the VAWA were "substantially weakened" by an attenuated link between interstate commerce and gender-motivated violence. *Id.* at 615, 120 S.Ct. 1740. "Indeed, we can think of no better example of police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id.* at 618, 120 S.Ct. 1740.

The teachings of *Lopez* and *Morrison* are what guide this court's analysis in Nicholson's case. Nicholson challenges 18 U.S.C. § 241 and 42 U.S.C. § 3631, two statutes that are very much related: both are criminal provisions which penalize civil rights violations, and both were under serious debate during the civil rights movement in the early to mid–1960's. Section 241 is the older of the two statutes, having been originally passed in 1948 and first amended in 1968. Section 241 provides criminal penalties for conspiracies to intimidate another from enjoying his civil rights. The statute provides in relevant part:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State ... in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States ...

[t]hey shall be fined under this title or imprisoned . . . .

18 U.S.C. § 241. Though § 241 was successful in accomplishing many of Congress' goals, it suffered from a number of problems. Principally, § 241 was only applicable to conspiracies, thus cutting off prosecution for action by a single individual. Moreover, § 241's penalties were inadequate in dealing with many racial violence issues, particularly those involving bodily injury or death. *See* S. REP. NO. 721 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1837, 1839–1841. To address these shortcomings, Congress' passed the Civil Rights Reform Act of 1968. Among the many components of this legislation was the Fair Housing Act, 42 U.S.C. §§ 3601–3631. The Fair Housing Act, which was predominantly provided for in Title VIII of the civil rights legislation, Pub.L. No. 90–284, § 801 et seq., 82 Stat. 81–89, included a criminal provision in Title IX that was incorporated into the Fair Housing Act as § 901, 82 Stat. 89. This criminal provision was . eventually codified as 42 U.S.C. § 3631.

Section 3631 of Title 42 provides penalties against any person who intimidates another person because of race and because that person is occupying a home. As one court has stated, "Section 3631 was clearly designed to protect an individual's right to occupy a dwelling of one's choice free from racial pressure." *United States v. Wood,* 780 F.2d 955, 961 (11th Cir.1986). The statute provides in relevant part:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with . . . any person because of his race . . . and because he is or has been . . . occupying, or contracting or negotiating for the . . . occupation of any dwelling . . . shall be fined

under Title 18, [United States Code], or imprisoned . . . .

42 U.S.C. § 3631.

Consistent with the analysis set forth in *Lopez,* the parties do not argue that § s 241 and 3631 regulate channels or instrumentalities of interstate commerce; instead, Nicholson takes issue with whether the activity subject to regulation (specifically that set forth in 42 U.S.C. § 3631) has a substantial relation to interstate commerce. Nicholson's claim is that, when it comes to Congress's Commerce Clause power, Congress is without authority to criminalize activity where, as provided in § 3631, the only link to interstate commerce is a person's "occupation" of a dwelling.

The magistrate began her review of Nicholson's claim by considering whether the intrastate activity of occupying a home is economic in nature. According to the magistrate, because of the statutory connection to housing discrimination, § 3631 "arises out of and is connected with economic activity." October 23, 2001 Magistrate Recommendation at 11. This economic activity, matched with Congress' aim at eliminating the negative effects of discrimination on the national economy, was, in the magistrate's view, enough of a tie to interstate commerce. *See* October 23, 2001 Magistrate Recommendation at 11.

Nicholson disagrees. In doing so, Nicholson distinguishes his case from a Fifth Circuit case cited by the magistrate: *Groome Resources Ltd. v. Parish of Jefferson,* 234 F.3d 192 (5th Cir.2000). In *Groome,* the court upheld the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f)(3)(B), as a proper exercise of Congressional authority under the Commerce Clause. The Fair Housing Amendments regulate the renting or purchasing of a home. This activity, according to

Nicholson, is itself a "commercial activity" whereas in his case the activity to be regulated is not.

In this case, it is alleged that Nicholson and others attempted to injure an unnamed Asian person because of that person's race or national origin and because that person was *occupying a dwelling*. While the sale, purchase, or financing of a home may have interstate commerce implications, the mere *occupation* of a home is not an economic activity that has a substantial relation to interstate commerce.

October 31, 2001 Objections at 3. Nicholson is of the belief that when it comes to enforcing a person's right to "occupy" a home, enforcement should be left to the states.

The government counters by arguing that, because the definition of "economic activity" is broad, the civil rights legislation at issue is easily considered "commercial activity" under the Commerce Clause. *See* September 21, 2001 Government Responsive Brief at 5. This legislation, according to the government, is analogous to the legislation upheld in *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), a case in which the Supreme Court held that Congress had the power under the Commerce Clause to regulate discriminatory practices of hotel chains. Moreover, the government points out that even the mere "occupation" of a home arises out of or in connection with the economic activity of the real estate market: "intimidation and violence aimed at the occupation of a dwelling directly affects the housing market by forcing victims to move, by intimidating potential victims from purchasing or renting homes in certain areas, and by discouraging people from renting or selling to minorities." September 21, 2001 Government Responsive Brief at 8.

Occupation of a home is not a static activity. To be sure, a person cannot occupy a home without expending energy, monies, or otherwise making some sort of investment in commerce. Everything from food purchases, outside energy sources, and travel all play a role in occupation of a dwelling as well as in commerce. *Compare Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)(holding that the production and consumption of homegrown wheat affects interstate commerce), *and United States v. Hicks,* 106 F.3d 187 (7th Cir.1997)(holding that fire insurance written by two out-of-state companies, fuel obtained from out-of-state, and a restaurant's use of food brought in from out-of state have a substantial effect upon commerce). It is these small effects upon commerce that can, in certain instances, add up to a large effect upon commerce. *See United States v. Jones,* 178 F.3d 479, 480–81 (7th Cir.1999)(affirming *Hicks* ). Thus, what becomes clear is that, at least in the aggregate, the occupation of a home is an economic activity that substantially affects commerce.

The question, however, is whether this conclusion is enough considering that the Supreme Court in *Morrison* warned against allowing Congress to regulate "conduct based solely on that conduct's *aggregate effect* on interstate commerce." 529 U.S. at 617, 120 S.Ct. 1740 (emphasis added). The Court's concern was that, at least in terms of gender-motivated violence, giving Congress authority to regulate any activity based upon a "but-for" causal chain would completely obliterate the Constitution's distinction between national and local authority. *See id.* at 615, 120 S.Ct. 1740 (citing *Lopez,* 514 U.S. at 564, 115 S.Ct. 1624).

Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of

violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class to which it is a part.

*Id.* at 615, 115 S.Ct. 1624. This is not to say that the Supreme Court foreclosed all economic reasoning done in the aggregate. In fact, the Supreme Court made it clear that it was not adopting a "categorical rule against aggregating the effects of any non-economic activity." *Id.* at 613, 115 S.Ct. 1624. Instead, the Court noted that its precedent has upheld Commerce Clause regulation of intrastate activity "only where that activity is economic in nature." *Id.* (citing *Lopez,* 514 U.S. at 559–60, 115 S.Ct. 1624).

The regulation at issue here is "economic in nature." Section 3631 was passed as part of the Fair Housing Act, the Fair Housing Act applies to the housing market, and the housing market is both commercial and interstate. *See Oxford House–C v. City of St. Louis,* 77 F.3d 249, 251 (8th Cir.1996)(holding that housing discrimination has a substantial effect on interstate commerce); *Seniors Civil Liberties Assoc., Inc. v. Kemp,* 965 F.2d 1030, 1034 (11th Cir.1992)("Congress had ample evidence before it, and was adequately aware, that its exercise of power under the Fair Housing Act was supported by the Commerce Clause."); *see also Fair Housing Act of 1967: Hearings on S. 1358, S. 2114, and S. 2280 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. 6–14, 23–24 (1967)(statement of Ramsey Clark, Attorney General of the United States, and the Attorney General's memorandum that Fair Housing Act was supported by Commerce Clause because of broad interstate effect of housing market); 114 Cong. Rec. 2536–37 (1967)(adopting as part of the record the Attorney General's memorandum); *Civil Rights Act of 1967: Hearings on S. 1026, S. 1318, S. 1359, S. 1362, S. 1462, H.R. 2516, and H.R. 10805 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 90th Cong., 1st Sess. 80 (1967)(statement of Ramsey Clark, Attorney General of the United States, that the Commerce Clause supports housing legislation).

At the very least, while the text of § 3631 does not define "occupation," the context in which the word is used suggests a substantial impact upon commerce. To wit, the statute surrounds the possessive form of occupy (occupying) and the nominal form of occupy (occupation) with the words contracting, negotiating, selling, purchasing, renting, and financing.[2] Even the definition of the term "occupy" implies something more than dormant activity: "to take possession of by settlement or seizure," WEBSTER'S NEW WORLD COLLEGE DICTIONARY 997 (4th ed.2001); "to dwell or reside in," AMERICAN HERITAGE DICTIONARY 1215 (4th ed.2000); "To reside in and use (a place) as its tenant, or regular inhabitant," OXFORD ENGLISH DICTIONARY (2d ed.1989), found on-line at www.oed.com. This suggestion is certainly strengthened by the Supreme Court's observance that the Fair Housing Act as a whole is "broad and inclusive" and should be given "generous construction." *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972),

---

**2.** The operative language of 42 U.S.C. § 3631 reads: "(a) any person because of his race, color, religion, sex, handicap, familial status, or national origin and because he is or has been selling, purchasing, renting, financing, *occupying,* or contracting or negotiating for the sale, purchase, rental, financing or *occupation of any dwelling,* or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings . . . ."

accord *Metropolitan Housing Development Corp. v. Village of Arlington Heights* 616 F.2d 1006, 1011 (7th Cir.1980). Indeed, as the Court of Appeals for the Eleventh Circuit held in *Wood,* " 'Occupation' " includes more than mere physical presence within four walls; the term clearly incorporates the right to associate in one's home with members of another race. *Wood,* 780 F.2d at 961 (upholding a conviction under § 3631 where the defendants beat a woman who entertained African American people in her home).

Nicholson points out that §§ 241 and 3631 lack an express jurisdictional element connecting the regulation to interstate commerce. The absence of this element, it is argued, fails to ensure, through case-by-case inquiry, that the occupation of a dwelling affects interstate commerce. The problem with this argument is that while a jurisdictional element "may" establish constitutionality, it also may not, standing alone, be sufficient to show constitutionality. As the Supreme Court stated in *Morrison,* a jurisdictional element would merely "lend support" to the argument that the statute has a sufficient link to interstate commerce. *See Morrison,* 529 U.S. at 613, 120 S.Ct. 1740.

An interstate commerce link can also be drawn from the legislative history surrounding § 3631 and the Fair Housing Act. Indeed, the legislative history is less than would be desired as most of the relevant statements concerning the Fair Housing Act's intent and coverage were made during floor debates on the bill and packed into short and intense periods of congressional consideration. "Title VIII was adopted by Congress from Senator Mondale's floor amendment to the 1968 Civil Rights Act. Thus committee reports and other documents usually accompanying congressional enactments are missing here." *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 147 n. 29 (3d Cir.1977). Sec-

tion 3631 itself was added during debate in the Senate. *See* 114 Cong. Rec. 4570–4573 (1968). Nevertheless, the Senate report on fair housing provides some insight into Congress' intent on aiding individuals who are the subject of racial violence.

Experience teaches that racial violence has a broadly inhibiting effect upon the exercise of members of the Negro community of their Federal rights to nondiscriminatory treatment. Such violence must, therefore, be broadly prohibited if the enjoyment of those rights is to be secured. Legislation that regulates intrastate commerce in order to assure the effective regulation of interstate commerce is a commonplace, and its constitutionality is beyond serious debate.

S. Rep. No. 721 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1837, 1842 (citing *United States v. Darby,* 312 U.S. 100, 118–19, 312 U.S. 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941), *United States v. Wrightwood Dairy,* 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942), and *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)). The enactment of Title IX of the Fair Housing Act (42 U.S.C. § 3631) was one of Congress's responses. Although the language of § 3631 is broad, it is also specific in describing both protected and prohibited activities. As the Court of Appeals for the Ninth Circuit noted in *United States v. Gilbert,* 813 F.2d 1523, the civil rights legislation now codified at 18 U.S.C. § 245, served as the model for § 3631: "When section 3631 was introduced in Congress, its sponsors noted the similarity to the criminal provisions of section 245. The criminal sanctions of § 245, and § 3631 by implication, reflect a broad purpose." *Gilbert,* 813 F.2d at 1526.

The link between § 3631 and interstate commerce is not an attenuated one, either. *Lopez* and *Morrison* were concerned about

links between legislation and commerce that were so attenuated that they served to "obliterate the Constitution's distinction between national and local authority." *Morrison*, 529 U.S. at 615, 120 S.Ct. 1740 (referring to *Lopez*, 514 U.S. at 564, 115 S.Ct. 1624). However, in this case, the language of the statute ensures the interstate commerce link: the link to interstate commerce is made only when a person occupies a home and that occupant is intimidated or interfered with because of this occupation.

This point is reinforced when comparing the facts of Nicholson's case with the Supreme Court's decision in *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), cited in support of Nicholson's argument. In *Jones,* the Supreme Court parsed out the text of the federal arson statute, 18 U.S.C. § 844(i), and found that though the statute contains a jurisdictional nexus to interstate commerce, the plain reading of the statute requires that the arson be to a building "used in" commerce or "in an activity affecting" commerce. In the *Jones* case, the arson occurred in a building that was solely used for everyday family living and not for commerce, thus the building was not covered by § 844(i). As the Court read the statute, § 844(i) was "not soundly read to make virtually every arson in the country a federal offense." *Id* at 859, 120 S.Ct. 1904.

While *Jones* is certainly noteworthy when it comes to considering Nicholson's Commerce Clause challenge, *Jones* is distinguishable on its facts. That is, a close parsing of the text in Nicholson's case reveals that, unlike in *Jones,* not every case of racial intimidation is a federal offense; rather, the intimidation, and in turn the link between the regulated activity and interstate commerce, must be directed at individuals who occupy a home. Just as the operative language of the federal arson

statute took *Jones*'s case outside Congress' Commerce Clause power, the operative language found in § 3631 keeps Nicholson well within.

In sum, the link to the housing market, the occupation of a home, and the intimidation itself are all facts which ensure that Congress' regulation of housing discrimination does not upset the balance of power between the States and the Federal Government. Congress has the power under both 18 U.S.C. § 241 and 42 U.S.C. § 3631 to protect housing rights not only at the time of purchase and at the time of sale, but also against violent interference during the time between purchase and sale. A person who wishes to intimidate a minority victim from purchasing a home cannot insulate himself from federal liability by intimidating the victim the day after the victim closed on a home. Thus, the court finds a rational basis for concluding that both 18 U.S.C. § 241 and 42 U.S.C. § 3631 regulate activity that sufficiently affects interstate commerce. These enactments, therefore, do not exceed the bounds of Congress' Commerce Clause power and are otherwise constitutional.

## II. Thirteenth Amendment

■ Beyond the Commerce Clause challenge, Nicholson argues that the Thirteenth Amendment fails to provide a constitutional basis for the civil rights statutes with which he was charged. The magistrate disagreed.

The Thirteenth Amendment was passed in the aftermath of the Civil War as an attempt to promote equality between black and white citizens. The language declares that "neither slavery nor involuntary servitude ... shall exist within the United States," U.S. Const. amend. XIII, § 1, and empowers Congress to enforce its provisions, *see* U.S. Const. amend. XIII, § 2. The Supreme Court has interpreted this

grant of power broadly, finding that Congress can affirmatively enforce the ban on slavery and involuntary servitude, and enact legislation to erase "all badges and incidents of slavery in the United States." *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Moreover, in *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Supreme Court opened the door to the inclusion of private acts of racial discrimination within the "badges and incidents of slavery" language as stated in the *Civil Rights Cases. See Jones,* 392 U.S. at 413, 88 S.Ct. 2186 (holding that 42 U.S.C. § 1982, a provision of the Civil Rights Act of 1866 which allows victims of racial discrimination to sue private defendants, was a valid exercise of Congress' Thirteenth Amendment authority).

Although the Thirteenth Amendment was originally directed toward African Americans, the Court stated that Congress can exercise its power under the Amendment to eliminate other forms of racial discrimination. *See McDonald v. Santa Fe Trail Trans. Co.,* 427 U.S. 273, 287–88, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)(finding that allowing whites to bring suit under the Civil Rights Act of 1866 was consistent with Congress' enforcement power under the Thirteenth Amendment). The Court also implied that the Thirteenth Amendment reaches discrimination based on ethnicity and religion. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987)(concluding that discrimination against Jews and Arabs was covered by § 1982–the same statute the Court found in *Jones* to be a valid exercise of Congress' Thirteenth Amendment power-without explicitly addressing the Thirteenth Amendment issue).

Nevertheless, there remains a paucity of cases concerning Thirteenth Amendment doctrine, no doubt due to in part the ex-pansive view of Congress' Commerce Clause power. *See Heart of Atlanta Motel,* 379 U.S. at 257, 85 S.Ct. 348 (noting that if Congress can act through the Commerce Clause, it may act, regardless of its true motive for the legislation); *see also* Dan Hasenstab, *Comment: Is Hate a Form of Commerce? The Questionable Constitutionality of Federal "Hate Crime" Legislation,* 45 ST. LOUIS U.L.J. 973 (2001)(outlining the constitutionality of proposed "hate crime" legislation under the Commerce Clause, the Fourteenth Amendment, and the Thirteenth Amendment). In *United States v. Hayward,* 6 F.3d 1241 (7th Cir.1993), cited by the magistrate, the Court of Appeals for the Seventh Circuit held 6 F.3d at 1250–51 that, "[b]ecause Section 3631(b) is part of the Fair Housing Act, its enactment was a proper exercise of the government's power under the Thirteenth Amendment to eradicate all incidents and badges of slavery." The magistrate concluded, therefore, that, even though Nicholson is charged with violating subsection (a) of § 3631, because subsections (a) and (b) protect the same class of people and protect the rights of an individual to freely associate in his home with anyone regardless of race or national origin, § 3631(a) was a proper exercise of Congress's power under the Thirteenth Amendment. *See* October 23, 2001 Magistrate Gorence Recommendation at 12.

Nicholson argues that the magistrate's reliance upon *Hayward* is misplaced in light of *Lopez* and *Morrison* and that *Hayward* should be reconsidered in light of those opinions. The court does not find such a reconsideration necessary. Section 3631's incorporation into the Fair Housing Act as well as the legislative history in support of the legislation lends particular credence to the Thirteenth Amendment's application. "Like the 1866 Civil Rights Act, the Fair Housing Title is an exercise of congressional power under the thirteenth amendment to eliminate the badges

and incidents of slavery." *Williams v. Matthews Co.,* 499 F.2d 819, 825 (8th Cir. 1974); *see also United States v. Bledsoe,* 728 F.2d 1094, 1097 (8th Cir.1984)(holding that 18 U.S.C. § 245, a statute passed on the same day as 42 U.S.C. § 3631 and for similar purposes, constituted a valid enactment under Congress' Thirteenth Amendment authority as applied to racially motivated interference with federally-protected rights). Slightly different wording between subsections (a) and (b) does not alter that conclusion. The magistrate's reliance upon *Hayward* is sound.

Nicholson's case boils down to a person's right to live in their home free from race-motivated violence. Arson, schemes to kill inhabitants who are not the same race, are the very examples of slavery and involuntary servitude to which this country has worked so hard to eradicate. The people of this great nation are not all alike, do not all share the same views, and do not always see eye to eye, but that is what makes this country what it is. "Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Jones,* 392 U.S. at 440, 88 S.Ct. 2186. And here, Congress has spoken with a pointed, lasting tongue: this type of violence will not be tolerated.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Patricia J. Gorence's October 23, 2001 Recommendation be and the same is hereby **ADOPTED**; and

**IT IS FURTHER ORDERED** that Michael Nicholson's motion to dismiss the indictment be and the same is hereby **DENIED**.